UNITED STATES of America

v.

Richard HILL.

Crim. No. 71–650.

United States District Court,
E. D. Pennsylvania.

March 22, 1972.

**346**

———◆———

Louis C. Bechtle, U. S. Atty., C. Oliver Burt, III, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Harry S. Tischler, Defender Assn. of Philadelphia, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This case is before us on defendant's Motion to Suppress Evidence. This is an interesting case in that both the arresting officer and the defendant testified as to the facts surrounding the arrest, and although there are material differences in their testimony, the requested suppression of the evidence seized at the scene of the arrest would not be in order on either version of the facts.

Certain facts were not disputed. At about 9:00 o'clock p.m., on May 24, 1971, the police radio broadcast a call to proceed to 58th and Chestnut Streets to investigate two white automobiles whose occupants were engaged in suspicious activity, possibly involving narcotics. A patrol car answered the call and pulled up behind the two autos. An Officer Robinson and his partner got out of their patrol car and approached the two parked vehicles from the rear. At the time of their arrival, the front vehicle had two persons in the front seat, two persons in the rear seat and one person standing next to the front passenger side window leaning into that window. On their approach two male occupants left the rear seat of the front automobile and together with the person who was previously leaning in the window started to walk away from the approaching officers. In the process of exiting the auto, one of the two dropped a gun. About this time another patrol car arrived on the scene and an Officer Davis got out and came toward the front door, curbside, of the front automobile. When the officers observed the weapon which had been dropped by one of the two occupants who had gotten out of the car, they arrested him and made the remaining occupants of the car get out so that all those involved could be searched for weapons. It is at this point that the versions of the story given by Officer Davis and the defendant Hill part company.

Officer Davis testified that when he came to the front door, curbside, of the automobile, he found Mr. Hill seated in the front passenger seat with two brown paper bags upon his lap. When ordered out of the car, the officer testified that Mr. Hill surreptitiously attempted to abandon both paper bags in the gutter along the curb next to the car. In so doing, he dropped one of the paper bags containing a quart bottle of beer, which broke. The beer soaked through the bottom of the bag and soaked the bottom of the other bag in such a fashion that when the officer leaned down to pick

them both up, he testified that the bottom fell out of the bag which did not contain the beer bottle, revealing a plastic bag filled with $20.00 bills which upon inspection the officer identified as counterfeit. The officer then arrested Mr. Hill and performed a search of his person, which search turned up $900.00 in good U.S. currency which was then confiscated.

Defendant Hill's version of these facts is slightly different. He testified that when the officers drove up behind the two parked cars, a friend of his was leaning in the front window of the front car in which Mr. Hill was a passenger, holding the bag containing the counterfeit money. Upon seeing the approach of the officers the friend then abandoned the money in the gutter and started to walk away until he was ordered to halt by the officer. The officers then ordered everyone out of the cars and proceeded to search Mr. Hill. They went into his pockets and found the $900.00 in good U.S. currency which he had on his person, and then they gave it back to him. At that point, one of the officers noticed the brown paper bag in the gutter, picked it up and opened it. Finding it to contain counterfeit money, the officer then placed all the occupants of the car under arrest and proceeded to take back the $900.00 which he had originally found in Mr. Hill's pocket when searching for weapons.

The police were justified in approaching the car to investigate even without probable cause to believe a crime was being committed. No one is protected by the Constitution against the mere approach of police officers in a public place. This conduct was obviously reasonable, but the response of some of the persons in the front car was to attempt to flee. They must accept what subsequently flowed from this. The fumbled gun in this case furnished the police with the cause to arrest one person and justified a weapon search of all present. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We cannot expect the police to run the risk

that another in this group of persons obviously known to one another might also be armed. And, even if the police exceeded the scope of the weapon search in going in the defendant Hill's pocket, as he claims they did, the good currency they then found need not be excluded as evidence in the case.

Both the police version and Mr. Hill's version of the facts agree that the bag of counterfeit money had been voluntarily abandoned. This being so, when the police officer finally found the bag in the gutter next to the car, he could properly seize and examine it. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). When it turned out to be counterfeit, the police had the right then to arrest Mr. Hill and his companions even if the police did not know which of them had abandoned the bag.

Let us examine the condition of the knowledge of the police officers on the scene at the time the bag of counterfeit money came to light, as it is this perspective which will determine if probable cause to arrest existed in fact.

Before arriving on the scene, the police received a call over their radio that indicated that someone had observed some activity which they thought suspicious and which possibly involved narcotics. When the police arrived on the scene they observed two cars parked one behind the other. The rear car was empty and the front car contained four occupants, the driver and a passenger in the front seat (which was Mr. Hill) and two passengers in the rear seat. In addition, a fifth person was leaning in the front passenger-side window. The persons involved were all adults. This activity all points toward some sort of transaction being carried out between the man leaning in the front passenger-side window, (who apparently was from the empty rear car) and at least some of those persons in the front car. The persons had all been there long enough for

somebody to call the police, for the call to go out over the police radio, and for the officers to respond to the call. They appeared to be adults, and not adolescents using the automobile as a mobile clubhouse.

By this point, of course, all of the surrounding circumstances were very suggestive, and created grounds for reasonable suspicion. When the police approached the front car, three of the persons in question, the man leaning in the front window and the two occupants of the rear seat attempted to flee. This added one further suggestive circumstance not wholly dispositive, but tending to indicate some unlawful transaction. The fumbled gun provided probable cause to arrest one of the then former occupants of the rear seat, to perform a weapons search of all involved, and added still another indication that some transaction was taking place which was probably unlawful. At this juncture, however, we cannot say that the state of the officers' knowledge rose above mere suspicion. There was nothing which would indicate some specific form of illegal activity.

The discovery of the bag of counterfeit money in the gutter beside the front car provided what was missing. All the surrounding circumstances up to then indicated a transaction, some dealing or exchange between the man from the rear car and at least some of those from the front car. The discovery of the bag of counterfeit money next to the front car made it quite reasonable to conclude that some negotiation, exchange, transaction or dealing concerning that counterfeit money was taking place between the man on the outside, quite reasonably assumed to be from the rear car, and at least some of those on the inside. Such a transaction is of course a crime. Probable cause to believe that the man outside was partaking in the transaction is created by his position; obviously he had come from the rear car to the front car for a purpose, and the surrounding circumstances and the bag of counterfeit money clearly indicate that that purpose

was some sort of transaction involving that counterfeit money. Any other conclusion would stretch the probability of coincidence to the limit, and must be held to establish probable cause to arrest. Second, it is important to note that he was leaning in Mr. Hill's window. Persons involved in transactions or exchanges would be expected to go to the window of the person with which they felt they were primarily dealing. The fact that the man from the rear car was leaning in Mr. Hill's window made it probable that he was dealing with Mr. Hill primarily, and established probable cause to arrest Mr. Hill.

We might stop here, as this is all that is really at issue in this case, but in the interests of completeness, the Court feels impelled to observe that, since the driver brought the car to the point of the apparent transaction, probable cause existed as to the driver. There might have been some problems as to the passengers in the rear seat, had they not attempted to flee, but this circumstance taken with the surrounding facts indicates enough guilty knowledge of the transaction to overcome any presumption that they were merely innocent passengers, and in the Court's opinion established probable cause for their arrest likewise.

We are not dealing with a crowded public place or a group of strangers or a piece of evidence like a weapon which was so small that it might have been carried by one person unbeknownst to the others, or was not likely to be the subject of the kind of transaction among the group which the surrounding circumstances suggest was probably taking place. We are dealing with a bag full of counterfeit money, some 570 counterfeit $20.00 bills. The facts were such as to warrant "a man of prudence and caution" to believe that each of the persons in question were involved in the commission of a crime. Stacey v. Emery, 97 U.S. 642, 24 L.Ed. 1035 (1878).

■ Once we have concluded that the police then had probable cause to arrest

Mr. Hill, we then must hold that they also had probable cause to perform a search of his person. We are dealing here with counterfeit currency and if the defendant were possessing counterfeit currency or indeed legitimate currency which appeared to be evidence of the crime which was reasonably suggested by the circumstances, and such evidence is fairly easily disposed of, the police need not run the risk of such disposal while attempting to obtain a warrant but are justified in performing such a search on the scene. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L. Ed.2d 327 (1959).

■ Although Mr. Hill contends that the police had already searched his pockets and found the legitimate currency, we rule that this error, if it occurred, does not taint the evidence, as the evidence was ultimately seized after probable cause to arrest Mr. Hill and search him had been established. The police gave Mr. Hill his money back initially, and only seized it after discovering the counterfeit money. If the police had not searched Mr. Hill to begin with, they would have searched him after probable cause had been established. In so doing they would, of course, have found the money which they had previously found. The Court feels that even if the first search was illegal, this is clearly a case where the evidence (being returned and later seized only after probable cause to arrest was established by wholly unrelated circumstances) is not the fruit of the illegal search and has not been "come at by the exploitation of that illegality" but instead has been come at " 'by means sufficiently distinguishable to be purged of the primary taint' " and further that the connection between the illegality and the evidence "[had] 'become so attenuated as to dissipate the taint' ". Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 44 (1963) quoting, Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Therefore, defendant's Motion to Suppress is denied insofar as it applies to either the 570 counterfeit $20.00 bills found at the scene of the crime or the $900.00 in good U.S. currency which was found on his person.

■ The Court notes that the real divergence between the version of the facts given by Mr. Hill and the version of the facts given by the police officers does not concern the competency of evidence but rather the testimony which relates the evidence directly to Mr. Hill. What Mr. Hill is actually claiming is that he is being "framed".

The Court does not wish to be interpreted as lending any credence to this proposition whatsoever. However, even if the Court were to believe this, it could not properly suppress the evidence on the basis of it. This is a matter which is to be reserved for the jury at trial and is not to be determined by the court on a pre-trial motion. This Court does not sit to make a pre-trial determination as to the veracity of the witnesses which are to be presented in the trial, except insofar as it bears on an issue which is properly an issue for a pre-trial determination.

■ Defendant Hill was arrested around 9:30 p.m. on the night in question and brought to the local police station of the Philadelphia police. Defendant Hill was brought into the presence of a Secret Service agent at that station about 1:00 o'clock a.m. the next morning and remained with him for around an hour and a half. Previous to this defendant Hill had requested the permission of the Philadelphia police, who then had him in custody, to make a telephone call but had been refused. The Secret Service agent informed the defendant of his rights including his right to an attorney and his right to stop the interrogation at any time and then began to question him. After a short period the defendant asserted that he did not wish to continue without an attorney and requested to use the telephone. A discussion followed this assertion which lasted some 45 minutes to an hour at which time defendant Hill signed a waiver and made a quite incriminating oral state-

ment of some 20 minutes length to the agent. The Court has concluded that this statement and any other statement made by Mr. Hill after his attempt to terminate interrogation pending advice of counsel are not admissible as evidence.

It appears from the testimony that the Secret Service agent initiated the discussion which followed defendant's attempt to terminate the interrogation. The subject of the discussion was the fate of defendant's wife including whether or not she would be held in jail overnight or charged along with the defendant. While the agent did not threaten to take any illegal action against the wife it appears obvious that he emphasized that even if she were innocent, the authorities did not know this, and that she would be held unless defendant made a confession exonerating her, at which time she would be released. The fact that this discussion was not prompted by Hill's spontaneous concern is clearly indicated, for the discussion went on for nearly an hour before Hill agreed to make his statement. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), holds that a prisoner may be interrogated after his arrest without counsel present but if "however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him". *Miranda,* supra, at 445, 86 S.Ct. at 1612. The "questioning" referred to in the quoted passes cannot be restricted merely to specific questions referring to guilt or innocence but must be understood to include the "interrogation" spoken of in Escobedo v. Illinois, 378 U.S. 478, (1964), at 485 and 86, 84 S.Ct. 1758, 12 L.Ed.2d 977, for it was to give meaning-

ful life to the *Escobedo* ruling that *Miranda* was decided. We must therefore take the questioning spoken of in *Miranda* to include any attempt initiated by the law enforcement officers "to 'get him' to confess his guilt despite his constitutional right not to do so". *Escobedo,* supra, at 485-486, 84 S.Ct. at 1762. Thus, when the defendant asserted that he wished to answer no more questions until he had talked to a lawyer, the Secret Service agent was forbidden by *Miranda* any attempt to convince him that he should, in fact, confess. It is true that *Miranda* does not preclude a defendant from subsequently electing to waive his request to terminate uncounseled interrogation, but that election must be reasonably spontaneous. We are not dealing with an off-hand remark by the agent which focused defendant on a consideration he had overlooked, and then prompted him on his own to reconsider his decision not to make any statement. We are dealing with nearly an hour of discussion the purpose of which on the agent's part "was to get him to confess his guilt despite his constitutional right not to do so". The statements are therefore not admissible against defendant.

Since this disposes of the issue, the Court need not reach the question of whether absent the request that his interrogation cease pending counsel, the agent's line of argument to defendant was coercive enough to taint the confession under the standards of Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L. Ed.2d 948 (1960). It is in order to observe, however, that to manipulate the defendant's decision by prolonged emphasis on its effect on the fate of his wife is a dangerous course at best, in that there is a good possibility that some defendants, even innocent ones, might under the circumstances make false incriminating statements to procure the release of a loved one.